IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KIMWEN LaMARROW STALLWORTH,
AIS # 11012126,                              :

      Plaintiff,                            :

vs.                                          :          CIVIL ACTION 10-0520-CG-C

THOMAS TATE,                                 :

      Defendant.                            :


REPORT AND RECOMMENDATION

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a Complaint under 42 U.S.C. § 1983.  This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendant, Thomas Tate  (Docs. 35, 36, 37); and Plaintiff's opposition thereto.  (Doc. 50).  For the reasons stated below, it is recommended that the motion for summary judgment of Defendant Tate be granted and that Plaintiff's action against Defendant be dismissed with prejudice.

I.  SUMMARY OF FACTUAL ALLEGATIONS

From its review of the record, the Court summarizes the parties' allegations, which are material to the issues addressed in this Report and Recommendation.  Plaintiff, Kinwen LaMarrow Stallworth, complains that Defendant Tate (1) failed to provide him proper medical treatment by removing him prematurely from Monroe County Hospital before his surgery was completed and all cancer was removed (Doc. 7 at 6) and (2) having him transferred to Kilby Correctional Facility where he has been denied requested surgery (Doc. 13 at 5).  Plaintiff

1

requests that his surgery be completed, that he receive proper medical treatment, that defendant[] be held accountable for failure to provide proper medical attention for a serious medical injury" (Doc. 7 at 8), and that the courts investigate "all counties and prisons medical services and staff." (Doc. 13 at 7).

On March 17, 2009, while incarcerated at Monroe County Detention Center, Plaintiff was taken to Monroe County Hospital Emergency Room for a "knot" on his right upper abdomen. (Doc. 36-4 at 3-5; Doc. 50 at 1).  The emergency room physician lanced and cultured the knot, cleaned and dressed the wound, and discharged Plaintiff with instructions to follow-up the next day for excision of the specimen so pathology of the lipoma could be obtained.  (Doc. 36-4 at 4; Doc. 36-5 at 28; Doc. 50 at 10).  However, Plaintiff was not taken back to the hospital the next day.  Plaintiff did not return to the hospital for excision of the lipoma until April 22, 2009.  (Doc. 36-4 at 8). The pathology report diagnosed the obtained specimen as a dermatofibrosarcoma protuberans that was "incompletely excised." (*Id*. at 10).[1]  Therefore, Dr. Stallworth recommended that another surgery be performed to remove the remaining tumor.  (Doc. 36-5 at 26).  On May 7, 2009, prior to the reexcision, Plaintiff was released from Monroe County Detention Center on probation.  (Doc. 36-1 at 2).  On May 22, 2009, while Plaintiff was on probation, the dermatofibrosarcoma was re-excised by Dr. Stallworth, but again, it was necessary to perform another excision on June 2, 2009.  (Doc. 36-5 at 16, 19).

On August 5, 2009, while on probation, Plaintiff went to emergency room at USA Medical Center for abdominal pain, and Dr. Gandy excised the recurrent tumor and reconstructed the right upper abdomen wall with Prolene mesh, and Plaintiff was discharged two

---

[1] "[A] dermal fibroblastic tumor composed of firm nodular masses that usually do not metastasize[.]" http://www.merriam-webster.com/medlineplus/dermatofibrosarcoma%20protuberans (last visited on April 1, 2013)

days later.  (Doc. 36-4 at 19-21; Doc. 36-6 at 28).  On October 29, 2009, Plaintiff requested a CT

scan due to symptoms of nausea and diarrhea post surgery; the scan showed a hypoattenuation in

the right lobe of Plaintiff's liver which was not clearly shown in his previous scan obtained on

August 5, 2009.  (Doc. 36-6 at 22; Doc. 36-7 at 8).  Based on this finding, a "followup for

stability [was] recommended," but there were no changes to Plaintiff's abdomen post excision of

the dermatofibrosarcoma and "[n]o obvious ventral hernia or recurrence of tumor [were]

visualized."  (Doc. 36-6 at 23).  Given the observed hypoattenuation, Dr. Gandy recommended

and scheduled surgery for December 10, 2009.[2]  (*Id*. at 22).

On November 9, 2009, Plaintiff was rearrested and sent back to Monroe County Jail.[3]

(Doc. 36-1 at 2).  On December 1, 2009, Plaintiff was seen at Tri-County Medical Center with

complaints of blood in stool, pain in pelvis, and abdominal pain from his previously removed

tumors, but no abnormalities were detected.[4]  (Doc. 37-1 at 4; 37-2 at 17-18).  On December 9,

2009, Plaintiff's probation was revoked, and he was released into the custody of Alabama

Department of Corrections and sent to Kilby Correctional Facility ("Kilby") on December 10,

2009.  (*Id*. at 3).  On December 11, 2009, Correctional Medical Services ("CMS") at Kilby

---

[2] Atop of the CT scan report, there is a handwritten note that states "surgery 12-10-09."  (Doc. 36-6 at 22).  Based on the notation, the Court assumes that the findings from the CT scan are the reason for the December 10, 2009 scheduled surgery, not the need to remove FDA recalled mesh as suggested by Plaintiff.  (Doc. 37-4 at 10-14).

[3] Plaintiff's prescription medications were obtained from Dr. Gandy, and Plaintiff continued to receive the prescribed treatment, including an abdominal binder. (Doc. 36-6, at 47; Doc. 36-7 at 2).

[4] This was not the first complaint Plaintiff had had of abdominal pain and bloody stools.  After Plaintiff's August 5, 2009, surgery with Dr. Gandy, on September 15, 2009, Plaintiff called Dr. Gandy complaining of blood in stool; Dr. Gandy advised him to eat applesauce and drink fruit juices and follow up with an internal medicine doctor.  (Doc. 36-7 at 19).  Dr. Gandy's medical advice suggests that Plaintiff's complaints have nothing to do with his dermatofibrosarcoma diagnosis. Dr. Gandy made no attempt to see Plaintiff based on these complaints or even suggest that Plaintiff return to his office for treatment if these symptoms persisted.

requested Plaintiff's medical records, specifically those relating to the abdominal tumor, from Dr. Gandy after Plaintiff complained of abdominal pain, bloody stools, and a missed surgery that was scheduled to occur on December 10, 2009.[5] (Doc. 36-6 at 43-44). Upon examination, there was tenderness observed at the surgery site but, otherwise, normal with no masses. (*Id*.). Plaintiff was given special needs allowances at Kilby to wear an abdominal binder, given a bottom bunk, and no heavy lifting for 180 days. (Doc. 37-3 at 33). On December 17, 2009, Plaintiff had an abdominal x-ray taken that showed "no soft tissue mass or pathologic calcification."[6] (Doc. 37-3 at 3).

Plaintiff was transferred back to Monroe County Detention Facility on April 11, 2011. (Doc. 36-1 at 3). Handwritten notes from Dr. Gandy's chart reflect that on April 29, 2011, Dr. Gandy's office was in contact with the staff at Monroe County Detention Center. (Doc. 36-7 at 12). There is one chart note that reads, "Patient is in Monroe County Jail states patient is in constant pain and they are having a recall on the mask [sic] in his stomach. Please call [telephone number at Monroe County Detention Center] with appointment." (*Id*.) It appears from the notations on the chart, Dr. Gandy's office contacted the Monroe County Detention Center, but the jail "did not know anything about the patient's scheduled general surgery." (*Id*.).

---

[5] Plaintiff informed the CMS staff at Kilby that the missed surgery was to remove mesh placed in his abdomen on August 5, 2009, but had since been recalled. (Doc. 37-4 at 10-14). Plaintiff was also seen on December 17 and 22, 2009, with the same complaints. (*Id*.). Plaintiff was accessed with possible trauma to the abdomen after altercation, incisional abscess, gastric ulcer, gastritis, or internal hemorrhoids. (*Id*.). He was treated with labs, an x-ray, and prescription medicines. (*Id*.).

[6] Throughout 2010 and 2011, Plaintiff complained of abdominal pain and rectal bleeding to Kilby CMS. No masses or abnormalities were ever found in Plaintiff's abdomen. (Docs. 37-3; 37-4). Stool analyses were performed that were negative, and Plaintiff was most often diagnosed with hemorrhoids and acid reflux. (Docs. 37-3 at 48). Despite numerous complaints of rectal bleeding and bleeding from his penis, the Court finds that Plaintiff refused every advised rectal, prostate, and testicular exam. (Doc. 37-3 at 22; Doc. 37-4 at 6). Plaintiff was also seen on several occasions for complaints completely unrelated to this action, i.e. knee pain, elbow pain, earaches, back pain, and eczema. (*See* Docs. 37-3; 37-4; 37-5; 37-6; 37-8).

Dr. Gandy's office then "informed Lieutenant Conner" of the scheduled "general surgery" for May 19, 2011.  (*Id.*).  A final notation states that the jail "will not pay for this visit."  (*Id.*).  The Court is unclear to which "visit" this is referring.  (*Id.*).

On May 6, 2011, Plaintiff was seen with complaints of bloody stool and intermittent stomach pain.  (Doc. 37-2 at 14-15).  The attending physician found no abdominal problems upon examination and, after discussing his prior surgeries and the missed December 10, 2009 surgery, planned a surgical consult with Dr. Stallworth to "reevaluate the patient."  (Id. at 15).  On May 16, 2011, Plaintiff was seen by Dr. Stallworth at Monroe County Hospital for a consultation.  (Doc. 36-4 at 34).  Dr. Stallworth investigated Plaintiff's need for surgery to remove the mesh in his abdomen by corresponding by facsimile with Dr. Gandy to find out the type of mesh used during Plaintiff's surgery.  (Doc. 36-4 at 18, 32; Doc. 36-6 at 40-41).  Dr. Gandy confirmed that Prolene mesh was used during the August 5, 2009 surgery.  (*Id.*).  Dr. Gandy did not indicate that there was a recall on the mesh, and Dr. Stallworth found no indication of a FDA recall on the mesh. [7]  (*Id.*).

Since being incarceration at Monroe County Detention Center on April 11, 2011, Plaintiff has received approximately 20 medical examinations from doctors and nurses at Monroe County Hospital and Tri-County Medical Center.[8]  (Docs. 37-1; 37-2).  At least half of these visits were for complaints of abdominal pain and bloody stools, and the other half were for unrelated

---

[7] Lieutenant Conner affirms that he "was present during an examination of Plaintiff by Dr. Stallworth at the Monroe County Hospital during which Dr. Stallworth contacted Dr. Gandy and the company that manufactured the mesh and ensured that the mesh material Dr. Gandy had used in Plaintiff's surgery was not subject to a recall."  (Doc. 36-2 at 7).  The Court also attempted to discern if there has been a possible recall of Prolene mesh, as used by Dr. Gandy on August 5, 2009, but found no FDA recall notice on this brand of mesh.

[8] On June 15, 2011, Tri-County Medical Center requested records, from Dr. Gandy (Doc. 36-6 at 39; Doc. 37-1 at 24).

complaints.  (*Id*.).  At each of these visits, whether Plaintiff complained of abdominal pain or

not, Plaintiff's abdomen was examined and no abnormalities were detected.  (*Id*.).  Where

abdominal complaints were the issue, blood tests were ordered to rule out gallbladder or

pancreas problems.[9]  (Doc. 37-2 at 7-8).  Again, to accurately diagnose Plaintiff's symptom of

rectal bleeding, doctors advised rectal exams, but Plaintiff again refused any rectal exam.[10]

(Doc. 37-2 at 10-11).

## II.  PROCEDURAL ASPECTS OF THE CASE

Plaintiff's complaint was filed in this Court on October 8, 2010 (doc. 7), and on

December 30, 2010, Plaintiff filed an amended complaint (doc. 13).  After a period of inaction,

Plaintiff was asked to inform the Court if he wanted to proceed with his action or risk having the

action dismissed, without prejudice, for failure to prosecute.  (Doc. 14).  Plaintiff responded on

May 14, 2012, and Defendants were served.  (Docs, 15, 16).  On June 21, 2012, a Report and

Recommendation was entered by the Court recommending that Defendants Monroe County

Hospital, Monroe County Jail, Correctional Medical Services (or Kilby Medical Staff) be

dismissed from the action with prejudice.  (Doc. 20).  An order adopting the Report and

Recommendation was entered on July 17, 2012.  (Doc. 24).   The sole remaining defendant,

---

[9] For complains related to abdominal pain and/or bloody stools, Plaintiff was most often diagnosed with hemorrhoids and acid reflux.  (*See* Doc. 37-1 at 11, 12, 13, 15 (hemorrhoids), 12, 32 (gastro-esophageal reflux disease); Doc. 37-2 at 2-3 (gastro-esophageal reflux disease), 4 (acid reflux).

[10] On August 23, 2011, Plaintiff was examined for complaints of nonspecific rectal bleeding.  (Doc. 37-2 at 10).  Plaintiff explained he had suffered from this problem several years ago, but not since.  (*Id*.).  The physician wanted to perform a digital rectal exam for Hemoccult status, but Plaintiff declined.  The doctor spoke with him  "extensively" about the need for the exam in order to tell if it was hemorrhoids or a "more serious GI bleed," but Plaintiff declined with no rationale except to say, "he doesn't believe this is necessary." (*Id*. at 11).

Sherriff Thomas Tate, filed his Answer[11] and Special Report on November 16, 2012, and the Court converted these filings to a Motion for Summary Judgment. (Docs. 35, 36, 37, 38). Plaintiff responded to Defendant Tate's Answer and Special report on January 14, 2013. (Doc. 50). The Defendants' motion for summary judgment and Plaintiff's response thereto are now before the Court.

## III. SUMMARY JUDGMENT STANDARD

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The *Federal Rules of Civil Procedure* grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. *Federal Rule of Civil Procedure* 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the

---

[11] In his Answer, Defendant Tate asserts the defense of absolute and qualified immunity. (Doc. 35 at 1). Plaintiff does not specify whether he is suing Defendant in his official or individual capacity or both. Thus, the Court will consider both. Defendant Tate is a state official and, thus, is absolutely immune from suit for damages in his official capacity. *See Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (state officials sued in their official capacities are protected from suit for damages under the Eleventh Amendment). Moreover, "[q]ualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). In determining whether qualified immunity is appropriate in a given case, "[t]he court must first ask the threshold question whether the facts alleged, taken in the light most favorable to the plaintiffs, show that the government official's conduct violated a constitutional right." *Dalrymple*, 334 F.3d at 995 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Having found herein that Plaintiff's allegations do not establish a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *See Stabler v. Fla. Van Lines, Inc.*, No. 11-0103-WS-N, 2012 WL 32660, *5 (S.D. Ala. Jan. 6, 2012) (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law." *AGSouth Genetics, LLC v. Cunningham*, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011).

## IV. DISCUSSION

Plaintiff alleges in his Complaint that his Eighth Amendment rights were violated by Defendant Tate when he (1) failed to provide him proper medical treatment by removing him prematurely from Monroe County Hospital before his surgery was completed and all cancer was removed (doc. 7 at 6) and (2) had him transferred to Kilby Correctional Facility where he has been denied requested surgery (doc. 13 at 5). The Court will review each of these claims in turn.

A.      Eighth Amendment Delay of Medical Care Claim.

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

*Sims*, 25 F.3d at 983 (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been

9

diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id*. (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. *Farrow*, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. *Estelle*, 429 U.S. at 106; *Farmer v. Brennan,* 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

*Farrow*, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the Eighth Amendment . . . when it is tantamount to unnecessary and wanton infliction of pain." *Hill*, 40 F.3d at 1187 (internal citations and quotation marks omitted). "Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to a layperson

because they involve life-threatening conditions or situations where it is apparent that delay

would detrimentally exacerbate the medical problem." *Id.*

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

The first question the Court must address is whether or not the surgery that should have

occurred on March 18, 2009, represented a serious medical need? The Court determines that it

does. A possible abdominal tumor is a condition that was diagnosed by the emergency room

physician on March 17, 2009, and any layperson would understand the seriousness of this

diagnosis.

The second question to be answered is whether or not Defendant Tate acted with

deliberate indifference to Plaintiff's medical need? Plaintiff claims Defendant Tate "fail]ed] to

provide medical treatment for a serious life threating problem by removing [him] from the

hospital to the county jail." (Doc. 7 at 6). This claim, as stated in the complaint, is not proven

by the record. There are no notes of Plaintiff leaving the emergency room against medical

advice nor are there any signed waivers of care. There are no medical records suggesting that

Plaintiff was forced to leave the hospital in any informal manner or against any physician's or

medical staff's order. Instead, the medical records before the Court show that on March 17,

2009, Plaintiff was escorted to the emergency room for a "non-urgent" knot and pain in his

abdomen, and after being treated, Plaintiff was released from the hospital to the sheriff's department in "stable" condition and told to follow-up at the surgery clinic the next day for excision of the knot. (Doc. 36-4 at 4-7; Doc. 50 at 10). There is no evidence that Defendant Tate removed Plaintiff from the hospital back to the jail denying him medical care.

There is, however, evidence that Plaintiff was not returned to Monroe County Hospital for surgical excision of the knot to determine its pathology until April 22, 2009, approximately one month later than medically advised. Once Plaintiff received surgery on April 22, 2009, a pathology report showed that the tumor was not completely removed, so two re-excisions were later performed by Dr. Stallworth (Doc. 36-5 at 16-21, 26) and a following surgery by Dr. Gandy (Doc. 36-6 at 28). Therefore, Plaintiff's claim that Defendant Tate denied him of proper medical care fails to state a claim and is essentially a delay of medical care claim. Therefore, the Court will analyze it as such.

To succeed in proving that the delay of medical care rose to a constitutional violation, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed . . .. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay. *Hill*, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted); *see also*, *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

Plaintiff contends that he was not taken back for surgery on March 18, 2009, because Defendant Tate "refused to pay the deposit for surgery to be performed," and that the tumor progressed during this time.[12] (Doc. 50 at 2). However, Plaintiff has placed no evidence in the

---

[12] Defendant Tate did not give an explanation or reason for the delay in Plaintiff's return to Monroe

12

record that the delay in the excision exacerbated his problem.  The discharge instructions do not state that the surgery was "urgent," which would evidence that Defendant Tate was subjectively aware and deliberately indifferent to Plaintiff's condition.  There was no emergency surgery performed or advised in the emergency room on March 17, 2009, that would suggest a life-threatening illness or problem.  Furthermore, there is no indication that had Plaintiff received surgery on March 18, 2009, instead of April 22, 2009, that the doctor would have been able to remove the entire tumor successfully, thereby negating the need for any subsequent surgeries.  In fact, it took four surgeries, by two different surgeons, to completely excise the dermatofibrosarcoma.  This does not suggest that Plaintiff would have been free and clear of all tumor related problems had he been returned to Monroe County Hospital on March 18, 2009.  Also, to the Court's knowledge, Plaintiff is free of cancer and has been for approximately three and a half years, so there is no evidence of a detrimental effect on Plaintiff's illness due to the delay.  (Doc. 36-2 at 9).  Therefore, Plaintiff has not carried his burden of proving that the delay in surgery constituted a violation of his rights under the Eighth Amendment.

> B.    Eighth Amendment Denial of Medical Care due to Transfer to Kilby.

Plaintiff claims that Defendant Tate violated his Eighth Amendment right by having him transferred from Monroe County Jail to a state prison facility after the revocation of his probation, causing him to miss his scheduled surgery and be denied adequate medical care thereafter.  (Doc. 13 at 4).  An inmate does not have a constitutionally protected liberty interest against being transferred to a less agreeable prison, *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Nichols v. Riley*, 141 Fed. Appx. 868, 869 (11th Cir. Ala. 2005) (noting prison officials may not transfer an inmate for retaliation purposes); furthermore, there is no proof that Plaintiff

---

County Hospital for surgery in his Answer or filed affidavit.  (*See* Docs. 34; 36-1).

was transferred for any retaliatory purpose.  Defendant Tate denies any responsibility for

Plaintiff's transfer to Kilby; Tate confirms that when Plaintiff's parole was revoked on

December 9, 2009, Plaintiff was turned over to the Alabama Department of Corrections

("ADC").  (Doc. 36-1 at 10; Doc. 36-3 at 3-4).   The arrest and booking records of Plaintiff

suggest that when he returned to Monroe County Detention Center on April 11, 2011, where he

is currently housed, it was due to his release from ADOC, as stated by Defendant Tate.  (Doc.

36-3 at 4).

Plaintiff claims inadequate medical care was provided while he was incarcerated at

Kilby.  (Doc. 13 at 4).    The medical care provider for Kilby, CMS, obtained copies of all his

medical records related to his cancer and surgeries.  (Doc. 36-6 at 43-44).  Numerous medical

examinations and at least one x-ray were conducted at Kilby, and no cancerous masses were ever

detected.  (Doc. 37-4 at 14; Doc. 37-3 at 3).  Plaintiff was seen with complaints of abdominal

pain, and bloody stools (Docs. 37-3 at 49; 37-4 at 6; 37-5 at 6, 8, 13, 18, 21, 27, 34, 36, 38;  37-

6; 37-8), and, yet, he denied every advised rectal exam (Doc. 37-4 at 6; Doc 37-3 at 22).

Plaintiff was typically diagnosed with hemorrhoids and acid reflux, but never was cancer

suspected.  (Doc. 37-3 at 48).  Plaintiff also received medical care for complaints unrelated to

this action.  (See Doc. 37-5 for examples of complaints of earaches, coughs, acid reflux, kidney

stones, and dental problems).   Plaintiff received medical care each time he requested it.

Although Plaintiff did not receive the surgery from Dr. Gandy that he is requesting while at

Kilby, there is no noted medical basis or urgency for the surgery based on the medical records

obtained by Kilby.  For medical treatment to rise to the level of a constitutional violation, the

care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to

be intolerable to fundamental fairness." *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir.

1991).  Therefore, Plaintiff's claim appears to be more of a difference in opinion of the medical

care and treatment received than an actual constitutional violation.  With that said, the Court

finds no evidence in the record that Kilby disregarded any known risk to Plaintiff.  *See Farmer*,

511 U.S. at 837.

In fact, the record demonstrates that from the first day Kilby CMS learned of Plaintiff's

cancer and surgical history, it contacted Dr. Gandy for a copy of Plaintiff's medical records,

treated Plaintiff's complaints as serious needs and actively investigated the symptoms for which

he complained. (Doc. 36-6 at 43-44); *see Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995)

(whether defendants "should have employed additional diagnostic techniques or forms of

treatment 'is a classic example of a matter for medical judgment' and therefore not an

appropriate basis for grounding" constitutional liability); *Harris*, 941 F.2d at 1505 (explaining

that a difference in medical opinion between the prison's medical staff and the inmate about the

inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a

prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."

*Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).  Additionally, there is no evidence in

the record that Plaintiff suffered any detrimental effect due to being denied surgery while at

Kilby.  *See Townsend v. Jefferson Cnty.,* 582 F.3d 1252, 1259 (11th Cir. 2009) (Inmate "failed to

provide medical records, expert testimony, or other evidence, other than her own testimony, that

any delay in treatment caused her to suffer any injury.").

Having failed to prove that Defendant Tate acted with retaliation or deliberate

indifference by having Plaintiff transferred from Monroe County Jail to Kilby, Plaintiff fails to

state a claim.  At no time was Kilby Correctional Facility aware of a serious risk to Plaintiff and

totally disregarded it.  In fact, it obtained records, performed examinations, and ordered tests in

attempt to treat Plaintiff.  Furthermore, the Court determines that Kilby did not act with

deliberate indifference concerning Plaintiff, and without a constitutional violation for lack of

medical care by Kilby Correctional Facility, Defendant Tate has no liability regardless of

whether or not he had any part in Plaintiff's transfer on December 10, 2009.

    C.    Eighth Amendment Denial of Medical Care by Defendant Tate.

Plaintiff was transferred back to Monroe County Detention Center on April 11, 2011, to

the Court's knowledge is currently housed there.  (Doc. 36-1 at 3).   While Plaintiff's complaint

lists only two claims against Defendant Tate, his filed Special Report (Doc. 50) appears to state

one more.  Plaintiff claims that Defendant Tate has shown 'deliberate indifference' to a serious

on-going medical illness.  Every day that [Plaintiff] sits in the custody of Sheriff Tate 'without'

medical surgery to remove cancer from his stomach purposes a substantial risk to his health, and

his life." (*Id*. at 8).  Plaintiff then requests the Court order that Plaintiff be provided access to Dr.

Gandy and surgery performed by Dr. Gandy.  (*Id*.).

While incarcerated at Monroe County Detention Center, Plaintiff received numerous

examinations.  Some of the medical visits were to the surgeon, Dr. Stallworth, who performed

his first three tumor excisions at Monroe County Hospital.  After being informed by Plaintiff of a

possible mesh recall, Dr. Stallworth contacted Dr. Gandy to inquire about the mesh used during

the August 5, 2009 surgery.  (Doc. 36-4 at 18).  Dr. Gandy faxed a copy of August 5, 2009,

operation note and pathology report.  (*Id*.).  Dr. Gandy did not indicate that there was a recall on

the mesh, nor did he state that Plaintiff's cancer had returned, nor did he stress that Plaintiff

needed urgent surgery, nor did he advise that Plaintiff contact him and schedule surgery, nor did

he suggest that Dr. Stallworth perform surgery.  (*Id*.).  In fact, there is no correspondence in the

record that suggests Plaintiff needs emergency or urgent surgery to prevent a serious medical condition from progressing.

There is evidence, although it is somewhat unclear, that Dr. Gandy's office has been in contact with Monroe County Jail, specifically Lieutenant Conner, and attempted to schedule surgery.[13] (Doc. 36-7 at 12).  It appears from this chart notation, that someone at the jail is aware that Dr. Gandy and Plaintiff are trying to arrange a surgery date.  (*See*, *supra*, pp. 4-5; Doc. 36-7 at 12).  However, the question remains as to whether or not the denial of the surgery is deliberate indifference?

There is no evidence before the Court that the surgery at issue, the one first scheduled for December 10, 2009, is urgent, life threatening, or a necessity.  The surgery was first scheduled when Plaintiff was on probation; since being rearrested, there have been plenty of times that Dr. Gandy has been contacted by other medical providers, and he has not once attached a note referencing the need for the surgery.  (See Doc. 36-4 at 18 where Monroe County Hospital requested records from Dr. Gandy; see Doc. 37-4 at 11; Doc. 37-6 at 16-18 where Kilby Correctional Facility requested records from Dr. Gandy; Doc. 37-1 at 24 where Tri-County Medical obtained a release of health information from Plaintiff to request records from Dr. Gandy).  Furthermore, at Monroe County Detention Center, Plaintiff complained multiple times of abdominal pain and bloody stools.  However, no abdominal tumors were ever suspected, rectal exams were declined by Plaintiff (Doc. 37-2 at 10-11), and he was usually diagnosed with hemorrhoids and acid reflux.  (Doc. 37-1; Doc. 37-2).

---

[13] Lieutenant Fred Conner states, "[n]o staff member at the Monroe County Detention Facility has received any notice or recommendation that Plaintiff receive any further medical treatment concerning the mesh piece or surgery site in his abdomen."  (Doc. 36-2 at 7).

The difference in the treatment received and that desired by Plaintiff appears to be a medical judgment call. The evidentiary record reveals no genuine dispute as to any material fact, and there is no evidence since April 11, 2011, that Defendant Tate knew of any objective need for surgery and disregarded that need by conduct that is more than gross negligence. *Id.*; *see also McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Whether Plaintiff disagrees with the efficacy of the recommended treatment or simply prefers a different course of treatment, such a complaint does not state a valid claim of medical mistreatment under the Eighth Amendment. *See, e.g., Adams v. Poag*, 61 F.3d at 1545; *Del Muro v. Fed. Bureau of Prisons*, 2004 WL 1542216, *4 (N.D. Tex. 2004) ("[i]t is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs.").

Considering the totality of the circumstances surrounding the medical treatment that Plaintiff received related to his complaints from March 17, 2009, to the present date, the Court cannot say that Defendant Tate was deliberately indifferent to his serious medical need. The record shows that, at all times, Plaintiff was treated for his complaints. There is no evidence that Defendant ever knew of an excessive risk to Plaintiff's health and disregarded it, nor is there "verifying medical evidence" that any delay in Plaintiff's access to medical care has detrimentally effected his medical condition. *Hill*, 40 F.3d at 1188-89. Thus, Plaintiff has failed to establish the subjective element of his Eighth Amendment claim, and Defendant Tate is entitled to summary judgment.

18

**V.  CONCLUSION**

Based on the foregoing, it is recommended that the motion for summary judgment filed by Defendant Tate be granted and that Plaintiff's claims against Defendant Tate be dismissed with prejudice.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this 3rd day of April, 2013.


s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

l.      **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982) (*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days[14] after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Transcript (applicable Where Proceedings Tape Recorded)**.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

---

[14] Effective December 1, 2009, the time for filing written objections was extended to "14 days after being served with a copy of the recommended disposition[.]"  FED.R.CIV.P. 72(b)(2).